Good morning, Mr. Sobel. Good morning, Your Honor. Good morning, may it please the Court. My name is Tom Sobel. I represent the proposed direct purchaser class. A little traffic cop at the beginning. I would like to take ten minutes as part of my argument. Mr. Hegedus from the FTC will take five minutes of the plaintiff's time. And then Mr. Shadowin will take three minutes of time. If my math works correctly, I believe that I am therefore seeking to reserve seven minutes for rebuttal if that's acceptable to the Court. Fine. Thank you, Your Honor. Because Mr. Hegedus for the FTC will address three broad issues of applicability in the wake of the Supreme Court's activist case, I would like to address two issues. First, the fundamental observation, the fundamental economic observation about settlements of patent cases in this kind of situation, which is crucial, I think, to the Court's understanding of these cases generally. And then I will move into the particular payments that are alleged here. When Hatch-Waxman cases are brought, there is no damage claim. There is a technical act of potential infringement by the generic simply having filed an application and making a claim that patents listed for that brand drug are either unenforceable, invalid, or not infringed. When that litigation starts, therefore, the positions of the parties don't have any damage claim. Instead, the position is this. The brand company's position is we have a valid patent. It is enforceable. You do infringe it. Therefore, you should stay out of the market until the last patent expires. That's the brand's position. The generic's position in that litigation is different. Their position is either you have an invalid patent, or it's not enforceable, or it's not infringed. We should be allowed to be on the market today. When that case gets settled, and most of those cases do, and most of those cases do settle on competitive terms, the way that those cases are to be settled, according to the United States Supreme Court, is by an agreed entry date somewhere in between the positions of those parties. And when those parties do that, that settlement will reflect the party's perceptions of the strengths and weaknesses of that lawsuit, and therefore will fairly adjust the rights of the parties, and therefore also make generics available in accordance with the strengths or weaknesses of those patents. That's a fundamental observation. This is the first part of the fundamental observation of activists. The second part of the decision then holds this. If you see some other payment other than the agreed entry date moving from the brand company to the generic company, and that payment is larger than the litigation expenses that the brand company might incur from there going forward, because it's going to settle a lawsuit, so it's going to avoid those, if you see a payment that is larger than that, what's it for? If the allegations are that it's for an entry date where the brand company gets to stay on the market longer than it otherwise would, then that's going to be subject to the rule of reason. The existence of a reverse payment larger than the avoided litigation costs raises an inference that the entry date is not a fair resolution of the merits of the claim, but instead may end up being something that's later, therefore get involved in the business of discovery and find out and get involved in the rule of reason. So when Justice Breyer talks about large, you take it he means larger than the costs of litigation, that it's a sort of per se equivalent and largeness is not measured by anything else? No, that's not my position. Okay, what is your position? I think what Justice Breyer writes is essentially two things. First, Justice Breyer writes the quantitative measure that you can find in his opinion is that it is larger than the avoided litigation costs. That's the one quantitative test. But I think in fairness also and in context the decision at one or two points says this squarely and certainly by implication means that it's large enough to have in some way caused the generic to agree upon an entry date that's later than it otherwise would have. There's a qualitative test to it as well. And so I think that, now I'll morph that, I think that's the answer to what our position is and I think that's what the allegations of this case show. Now before I talk about the allegations of this case, I think it's important to articulate that if you look at what was stated in Activist itself by way of what a large payment was, is that Justice Breyer did not undertake a precise quantification of what the payment was. Instead looked at essentially the general mix of what looked like out there and the general parameters of what the size of things were. You're talking about many millions of dollars. When you talk about many millions of dollars, that's sufficient to get into the rule of reason. Similarly, the Third Circuit recently in the King drug case looked at general allegations about the magnitude, if you will, of what the payment was rather than a very precise quantification. And how does one look at, how do I find out what the litigation expenses are? Well, the allegations Part of the settlement, is it in the settlement document? It is not in the settlement document, Your Honor. The allegations in the case are that the tens or hundreds of millions of dollars of this payment certainly far surpass any notion of what the allegation is of what the contemplated future litigation costs were. There's also some language in Activist that talks about how in patent cases like this the future litigation costs at a certain point in time might be of as much as like five or ten million dollars, something like that. But you're not talking about anything of the magnitude of the size of the payments that are involved here or in most of these other cases when you're talking about many tens or hundreds of millions of dollars. To pursue Judge Torea's question, has the FTC studied and does it have documentation on average costs? Yes, and you also see a citation to that in Activist itself, Your Honor, as well. So if we look then to the payments that are alleged here, they come in essentially, the payment, if you will, comes in four forms. The first and most fundamental and most dispositive is what's called a no-authorized generic agreement. But essentially this agreement, what this means is that the brand company promises, Your Honor Chilcott promises Watson that when you go on the market, Watson, we agree not to compete with you. We will not take our branded pills, label them as generics, and compete with you in the market for the first six months that you're on the market. And by doing that, as we plead, Watson then therefore knows two things. It knows for sure that it gets all of the generic sales during that first six months. So it's doubling what it otherwise would get, because it would otherwise have to split in half that market with Warner Chilcott. And Watson also knows for sure that because it's the only generic on the market, it's going to charge consumers more, because it's the only generic on the market. It doesn't have to compete with another generic. We plead that that is worth many tens or hundreds of millions of dollars in this market, because in this market this is a $200 million a year drug. So that's first and foremost. There then also is a promise to Watson by Warner Chilcott that Warner Chilcott will not settle with any other generic companies and allow them into the market during that first six months. And that's crucial, because that basically makes sure that Watson knows that it's going to be able to be in the market for those six months on its own, rather than have competition from anybody else.  And then there are also two additional deals that we plead are a part and parcel of this overall package of consideration that's being given to Watson to delay for four and a half years, by the way, its launch, which is what we plead. Watson agreed that it was going to delay its entry for four and a half years into the market. And what those two other agreements are is essentially that, for one, for Femmering, the argument, the deal is that Watson will do some detailing for Warner Chilcott, get paid for that detailing, but then also on top of that get 50 percent of the net sales of a drug that Warner Chilcott developed, got approved, put into the market and makes. And yet Watson is going to get 50 percent of those net sales and in addition get paid for its detailing. And then finally there's a provision for it to do a business deal with respect to another product. And on that other product, I may just finish this last piece. On that other product, which also Warner Chilcott develops, has the intellectual property for, they make it, they then label it with Watson's name. Watson has to simply distribute it. And for that product, Watson gets at least 70 percent of the net sales. In context, in other words, what we say is that this case is literally no different than the activist case in terms of the details of the pleadings and the need to go forward on a rule of reason analysis. Thank you. Mr. Hagedis? Good morning. Good morning, Your Honors. May it please the Court, my name is Mark Hagedis. I'm appearing on behalf of the Federal Trade Commission. The FTC appreciates this opportunity to explain why the Supreme Court's decision in FTC v. Activists applies to reverse payment agreements that do not involve cash. The FTC urges this Court to join with the Third Circuit in its King Drug decision where it held that under the rule of reason analysis prescribed by Activists, a reverse payment does not need to be in cash. Antitrust analyses focus on economic substance and not form. And so I'd like to make three points today involving economic substance. First, economically, a no AG agreement operates like a cash payment. Second, the economic substance of a no AG agreement qualifies as a reverse payment under the Activist decision. And third, the District Court's decision here elevated form over economic substance, contrary to the prescriptions and the case law involving antitrust. As to your second point, are there any limiting principles or are you saying that any non-AG settlement itself automatically falls under Activists? Activists itself provides limiting principles. First of all, there is the principle that the settlement involves an economic payment that wasn't at issue in the litigation. My colleague, Mr. Osobo, well described how within patent litigation, you are litigating over the possibility of entry by the generic. And so a settlement that is along the lines of a entry date is something you would expect from a settlement of that patent litigation. And in fact, what we see in terms of the patent litigation settlements that are reported to the FTC is that a vast majority of those settlements don't involve payments. So when you have a payment, when you have something in the agreement that wasn't at issue in the case, that is one limiting principle. The second limiting principle has to be... Sorry, I'm now going to go back to Judge Torea's concern. How would a court know really what was involved in terms of issues in order to say, well, that issue wasn't raised in the litigation? Does that have to be put in the pleadings? Your Honor, the knowledge about what was involved comes from the fact of in the patent litigation, the dispute is regarding the validity or the non-infringement of the patent. And so the natural and traditional way to settle that case is on an entry date. So when you introduce these new elements... It sounds to me like you're going back to a sort of per se rule. Even if the patent laws allow non-HE settlements, if you have one, there is reason for immediate suspicion under Actavis. Your Honor, it's not a per se rule. The other part of this, however, is that there is an opportunity for the brand to share monopoly profits with the generic. And that's also what makes it unusual under Actavis. The other aspect that makes it not per se is the fact that the plaintiff under Actavis must allege market power. Oh, surely. Surely market power exists in this industry for just about everybody. Your Honor, although that issue is often hotly contested by the pharmaceutical companies when plaintiffs allege market power, but the reason why it is different and falls within the rule of reason is the requirement that there be the allegation of market power as well as the large payment. And as Mr. Sobel described, that large payment is unusual because of the fact that normally we see these types of litigation settling on the terms of an entry date. It seems to me that the key word in this case is payment. What definition is of payment? Am I correct? That is... Do you agree with me? Yes. The definition I found in the dictionary is the delivery of money or its equivalent in either money or in other things of value. Would you agree with that? Yes, Your Honor. How about barter? Barter quite possibly if it is a vehicle under activists to result in the brand sharing monopoly profits with the generic. Thank you. I think your time is up. Yes. Thank you very much, Your Honors. Good afternoon, Your Honors. Steve Shadowin on behalf of the NPAIR plaintiffs. I want to just... Still morning. Still morning. Good morning. With respect, I'd like to address two issues. One is the acceleration clause issue. The NPAIR plaintiffs allege that the agreement with Watson had in it an acceleration clause. This later filing generic manufacturer managed to get into the market somehow earlier than the agreed date with Watson that Watson's date would be moved up accordingly. We allege that this is anti-competitive for... We believe that that's a plausible allegation for reasons that I'll get into. But the very first thing to tell you is that the district court below never addressed this issue. He dismissed the claim with respect to it but never discussed it. Yes, but we can ourselves decide issues that are raised in the district court in support of an opinion. Yes, you can. I'm just pointing out that it wasn't addressed. And if the case is going to be remanded for the reasons that my brethren have said, you may consider just remanding that issue. But I'm happy to address the substance of it. It clearly is a plausible allegation for the following reasons. Number one, the Federal Trade Commission itself alleged that in the provisional litigation that's cited in our brief, that an acceleration clause was just like a most favored nations clause and had an anti-competitive effect of deterring subsequent generics. Secondly, the CEO and chairman of one of the largest generic manufacturers in the world went before Congress and swore under oath that these acceleration clauses were anti-competitive. And he gave the reasons why. And he's clearly engaged in the industry, is knowledgeable about the industry, and he says they're anti-competitive under oath. Then we have the whole body of law, both economic literature and judicial opinions, that most favored nations clauses can be anti-competitive. And our allegation is not that all acceleration clauses are or that they're per se illegal. We say they're subject to the rule of reason and that our allegation that this acceleration clause is anti-competitive is plausible and that we ought to be allowed to create a record on it. And just on the policy issue, I will tell you, one of the great things about the rule of reason and what the court did in Actavis is, it's going to give everybody a chance to get into the records in these cases, get into discovery and expert reports, and determine what is pro-competitive and what's anti-competitive and we want the opportunity to do that. At huge costs in litigation that may, in fact, in the end, increase the price of drugs. Well, if what we say is true, is true, and we believe that it is, it's the massive cost to consumers of these agreements that are occurring right now. The cost of litigation is a drop in the bucket. Thank you, Your Honors. Thank you. Mr. Milne, good morning. Good morning, Your Honors. And if it pleases the Court, Robert Milne on behalf of Warner and Schilkot and with me is my colleague, Mr. Brian Gant. Your Honors, if the Supreme Court, if the plaintiffs are right here, if the FTC is correct, that what the Supreme Court had in mind was a rule that said anytime there is a patent settlement between pharmaceutical companies. Excuse me, did the Supreme Court use the word cash anywhere in that opinion? It used the term money. Payment, did it? It used the term, when it was expressing the kind of payment at issue, it used the word money, it used the word dollars repeatedly. It never used the word, it never adopted, the Supreme Court never adopted the definition of payment that you see espoused in the FTC and the plaintiff's briefs in this case. Stepping back. Well, payment is nothing but consideration. Well, Your Honor, what we need to focus on is what the Supreme Court tells us in Actavis. And I believe that it is very clear that the Supreme Court in Actavis was not focusing on a dictionary definition of payment or an all-consideration articulation of what a payment could be. How do we know that? Because what the Court said, and it's very clear, it said that what it's trying to do in this opinion is to distinguish between traditional settlements, settlements involving traditional settlement considerations, and I'm referring to pages 2236, 2233, and other references in the Court's opinion, referring to traditional settlements, which may involve the kinds of normal back and forth and normal kinds of agreements, which may include things like compromising a damage claim or a business transaction done alongside the patent settlement, which is a common way to settle disputes. Well, let me ask you this. From a policy standpoint, do you see any difference between a settlement that includes cash and a settlement that includes things other than cash? Well, Your Honor. Does it affect the antitrust laws in any way? I think the proper distinction, Your Honor, is not necessarily between, and I would just note that Judge Smith, in his opinion, did not say cash and cash alone. He said cash and close equivalents or close analogs. But I think what the Supreme Court was trying to do here, and I think the only fair reading of what the Supreme Court was doing here, was distinguishing between traditional settlements and the kinds of consideration that clearly flow to a generic flow both ways. Do you answer my question, though? Well, there's no economic distinction, Your Honor, between cash and properly quantified. From a policy standpoint, does it affect the enforcement of the antitrust laws, whether you pay in cash or whether you pay in kind or barter or other forms of payment? Your Honor, I think it makes a big difference in a variety of ways. One way is the ability to quantify, and this came up in some of the questions that arose earlier. The way to distinguish between a traditional settlement, one that clearly can be very valuable, and let me just, to finish the point on that, the Supreme Court identified as falling in the traditional category at least three types of settlement that are clearly very valuable and which you could say involve payment. For example, a fair value business transaction alongside a patent settlement. The Supreme Court said that doesn't raise the same kinds of concerns. The Court said this at 2236 of its opinion, that if you have, and there's clearly consideration flowing there, or just the simple entry date only settlement. Every day of early entry that the generic gets is worth tens or hundreds of millions of dollars to it. The compromise of a damage claim, the Court put into the category of traditional settlement, and the Court said there that that could be viewed as if you have a $100 million damage claim, you settle it for $40 million, it's a $60 million implicit net payment. So what the Court is focusing on is this distinction between consideration that flows through traditional settlements and then, on the other hand, naked consideration. And when we talk about cash, it's easy to see that that's naked consideration. Or if we talk about a settlement that is not fair value, that where there's a business transaction that is not for fair value. But a no AG agreement has value. It has clear value in allowing the generic to be on the market without competition. Well, so there are three categories of payment that are raised here. And with respect to the no AG, which is really an exclusive agreement. It's a patent license between a single licensor and a single licensee. And the Supreme Court, for decades in its jurisprudence, has drawn the distinction between the kinds of conduct that, you know, basically at the heart of the activist decision here is a balancing between patent policy concerns and antitrust policy concerns. And what the Court said in activist is that, describing its prior jurisprudence, that to strike that balance, what we've done over the years is first we ask the question, is that conduct specifically authorized by the Patent Act? If the answer is yes, then no further antitrust scrutiny for that kind of conduct. That falls within the traditional category, Your Honor. I can understand that I believe your position is that you do not defend the district court's rationale using the term cash. But you would draw the distinction elsewhere. And you would draw the distinction between traditional settlements, which include anything authorized by the Patent Act, including both acceleration clauses, side deals, and non-AG agreements. But Actavis doesn't actually talk in language like that. So from your point of view, you would like us to dismiss the case, not just send it back on a theory that the theory was wrong. Because you say these pleadings don't amount to a sufficient Actavis claim anyway under your theory of what Actavis does allow. Am I correct? Your Honor, we don't believe that affirmance depends on adopting the rationale that Judge Smith articulated. That's clear. Now we have to resolve the case. Do we remand it? Do we make the decision ourselves based on the pleading? And what I would say, Your Honor, is that the words of Actavis tell you that you can and should dismiss this complaint. And that combined with the pleading standards under Twombly and Iqbal tell you that you should dismiss this case. And the reason I say that is I think we are really, when you focus on the language of Actavis, the language of Actavis says that to strike that balance, that is the balance between patent and antitrust concerns, this Court has asked the question over time whether the patent statute specifically gives the right to do the thing in question. And, by the way, there wasn't that issue in Actavis, an exclusive license term like we're now talking about here, so the Court had no reason to specifically address that issue. But the Court repeatedly talked about that balance and even flagged that in the context of that case, no one on the defense side had identified any conduct that had been specifically authorized by the Patent Act, either expressly or by fair implication. And the Court specifically cited the U.S. v. General Electric case in which there was a license provided by General Electric to Westinghouse and there was vertical price fixing, admitted vertical price fixing associated with that license, which at the time was a per se violation of the Sherman Act. And the government came in and said, well the patent doesn't protect that, that's price fixing. And the Supreme Court said, and this was cited again in Actavis, that where you have a single license between a patentor and a patentee and not multiple licenses involving multiple patent holders, that that is conduct that is authorized by the Patent Act and therefore not subject to the antitrust scrutiny. So the Court is clearly carving out and saying that kind of conduct falls into the category of traditional, even though there's value. We know there can be value. Suppose we have a non-AG agreement, but the amount of profit going to the generic manufacturer looks awfully large. But, Your Honor. Are you, on that type of pleading, are you saying they failed to meet the pleading standards? If you accept, and we don't believe you should accept, that the mere fact that there may be value in an exclusive license, we acknowledge that, that there's value in an exclusive license. There's also the issue of TRNCO, which we talk about in the briefs, but I'll set that aside. If you acknowledge that there's cognizable, could be a cognizable payment, there's a pleading issue as well. That's right. And they say it's really large. Let us give you some estimates in our pleading based on market size, typical litigation costs. Do you admit of the possibility that that could be an Actavis case? Well, Your Honor, again, subject to our basic position that this is conduct that falls into the traditional category. I understand that. In this case, the answer is no, because there's no dispute that when you're looking at these things, you should look at them at the time the agreement was done. And when you see the plaintiff's statistics and their calculations, they make, and certainly the allegations and the complaints, they say nothing about the situation at the time the settlement in question was entered into in 2009. In 2009, among other things, the very legality of brand companies using authorized generics was being called into question. There was legislation pending in Congress that would have made it unlawful to have an authorized generic. The incoming presidential administration was saying that they supported outlawing authorized generics. FTC officials were suggesting that the use by branded companies of authorized generics could be an antitrust violation. And so the fundamental issue with the payment is, is there some kind of transfer of profits, patent protected profits from the branded company to the generic company? And so here at the time, how valuable would it have been for Warren Chilcott to say, I'm not going to introduce an authorized generic, at a time where they may well have been outlawed in the next six months. And beyond that, Your Honor, in addition... It's hard to bet on what Congress is going to do. Well, then you have FTC officials commenting there might be antitrust problems. There was a large study going on, being funded by the FTC, that was calling into question the whole practice of authorized generics. So at a bare minimum on pleading, and Judge Smith I think was very correct in saying we need something concrete in the pleadings to make it plausible that there was some kind of viable payment here. And at a minimum, that needs to take into account the circumstances at the time. There's also facts pled in these complaints that further undermine the value of any alleged promise not to introduce an authorized generic. And that is that the plaintiffs claim that Warren Chilcott had a plan to discontinue the branded product Lowestern in favor of a new branded product that it was going to be coming into the market with. And so the idea that Warren Chilcott was going to take this Lowestern branded product off the market and replace it with another branded product that it would be promoting, but then at the same time introduce an authorized generic of the old branded product, just further undermines the plausibility of this promise made back in 2009 when the antitrust laws were very different about how the treatment of these patent settlements could be viewed as a large payment at all we would contest, we would submit, let alone a large payment. And so for all of those reasons, including the Trinko point, which I won't elaborate because it's covered in the briefs, we think that piece of the case should be dismissed. Absolutely. How do we get all of that from the pleadings? Our focus is on what the plaintiff has put in their pleadings. All of this environment that you just outlined, you're saying that their pleadings would have to, in essence, plead a negative or plead circumstances that may have been totally within your control and knowledge in order to succeed in putting together a successful pleading. Your Honor, I respectfully, I would disagree with that. I mean, the points that I made, the point about the subsequent branded product coming onto the market to replace the old one, the plaintiffs pled that. That's part of their pleadings in this case. It just happens to undermine the value of any promise to introduce an authorized generic. The fact of the situation at the time, the legislative environment, the conduct of the FTC at the time, those are matters of public record. Everyone knew about those. And I would go back again to the whole idea that this type of license falls within that which is specifically authorized by the Patent Act. If I could spend just a couple of minutes speaking about the contemporaneous business transactions, which are also alleged as payments. The court, that's another situation where we have a pleading failure because what the court said, what the activist court said is that to strike that balance between patent and antitrust considerations, what you need to do is look at whether you have a traditional kind of settlement form. And the court said that where a reverse payment reflects traditional settlement considerations, such as fair value for services, that is not the same concern of the patentee using its profits as a naked payment to have the generic stay off the marketplace. So fair value falls into that traditional category of settlement. Now, the plaintiffs say, well, that's a defense because elsewhere in the opinion the court uses the word justification around mentioning fair value. But I think that passage I just read to you from 2236 and also even more clearly at 2237 of the court's opinion where the court says the likelihood of a reverse payment bringing about anti-competitive effects, that's the threshold issue that the plaintiffs have to plead and ultimately prove is, is there an anti-competitive effect? The court says, depends upon a variety of factors including its independence from other services for which it might represent payment. Fair value. And so that is something that needs to be pled. The plaintiffs pled nothing on that. They pled one side of the equation. There are four business transactions that are at issue here. Three of them involve the generic having to actually pay royalties back to the brand, not the other way around. One of them, a co-promotion agreement, does involve the brand paying money to the generic, but in return for services. They allege nothing about the services, even though they had the relevant agreements. Before these amended complaints were filed, Better make it short, though. The relevant agreements were provided to the plaintiffs. So for all of those reasons and the reasons covered in more detail in the briefs, we would urge affirmance. Thank you, counsel. Mr. Blatt. Hi, I'm Lee Blatt for the Lupin Defendants. Actually, Mr. Sobel wanted to get up here, I think, because nobody from the appellants mentioned anything about Lupin in their opening. None of the payments that they mentioned had anything to do with Lupin. This is a pleading standard case. Judge Smith said that the payment had to be cash or a close analog. Judge Sheridan, in the Fetzer case in the District of New Jersey, said that the payment has to be able to be reduced to a dollar value. Well, that seems to be the argument that I got from your colleague that just sat down, is that the reason why he doesn't agree with it being other than cash is because it's difficult to figure. Is that basically the argument? Under Judge Smith's ruling and under Judge Sheridan's ruling in the Fetzer case, the payment has to be something that the district court at the pleading stage can value, reduced to a dollar amount. If they can't, there's no way for the district court to determine under activists whether the payment was large and unjustified. An activist sets forth that standard. And would you accept reasonable estimates? The claim has to be plausible. Right. It doesn't have to be reduced. So you don't need exact cash values for it to be plausible? It has to be. The value has to be determined so that the district court can determine the plaintiff has made a plausible claim that the payment is large and unjustified. Now, in this case, there's nothing alleged about Lupin. There's no value alleged about any payment to Lupin. None. There's no cash value. There's nothing that's converted to a cash value. All that's said in the complaint is that the alleged payments to Lupin were large and valuable. Under ITBAL, that kind of conclusory statement has to be stricken from the analysis. We have to look at the facts that are pled. In most of these cases, when they're argued at appellate level, the question is, okay, were there the facts that were alleged sufficient to make the claim plausible? In the Lupin context, there were no facts at all pled. And they did not argue any differently here today. They didn't argue any differently in their brief. What they argued was there's a different standard. The large and unjustified standard articulated by the Supreme Court actually doesn't apply. All we have to show is that the payment was something of value that would cause the generic not to come to market and was something they couldn't have received had the case gone to verdict. There's nothing in activists supporting that. Activists does not discuss that standard at any point in the opinion. And in Paragraph 4 cases, any payment from the brand of the company to the generic is by definition something they could not have obtained in the case because Paragraph 4 litigation only involves injunctive relief. So activists discusses whether in a Paragraph 4 case a payment is anti-competitive. Not all payments are anti-competitive. The district court has to analyze whether the payment is anti-competitive under the large and unjustified standard. If the plaintiff's, if the appellant's standard is correct, activists could have been a three-paragraph opinion. All you have to decide is, is this something they could have obtained in the litigation? If not, case is over or at least it's anti-competitive, we go to discovery. That's not the standard in activists. That's not the standard that this court should adopt. And for the reasons we state in our brief, there's no fact pled here to suggest that the value of a payment to Lupin, none. There was no basis for the district court to conclude anything about the value of the payment to Lupin. And in that situation, the plaintiffs have not borne their burden of establishing a large unjustified payment under activists. And the complaint was properly dismissed, and the decision below should be affirmed. Are there no questions? Thank you. Mr. Solu. Thank you, Your Honor. First, the direct purchaser complaint, the complaint that I represent, we don't have Lupin as a defendant. Our allegations go with respect to the deal between Warner Chilcott and Watson, which palpably show that there is an actionable claim under activists. Why? Well, first, just to make it clear, the Third Circuit has already decided all the issues that are before you here today. And there have been eight district court decisions that have also come down on precisely these issues. Not a single district court or the Third Circuit disagreed with our position, except for Judge Smith, his ruling, and another ruling that happened below in the Third Circuit, which ended up getting reversed by the Third Circuit. So there is plenty of persuasive literature out there for you to read from your other jurists in the country about where you should come down on all of these legal issues and all of the points that have just been raised by the defendants. Now, Your Honor, there are limiting principles. The limiting principles are two. The first is that the payment has to be in excess of avoided litigation costs. And then second, that it has to be alleged to be in exchange for a generic delay. Those are the limiting principles. There are also two other things that I'll call sort of bonus points for a plaintiff, if you will, that the Supreme Court remarks about in activists. If the payment is something that you couldn't win in the litigation, that sends up a big red flag, so says Judge Breyer. So, for example, you can't win in a patent infringement lawsuit a right to be in the market by yourself without authorized generic competition. If you win the patent lawsuit, the generic still is going to face competition by the brand when the generic enters the market. That can't be won. It's completely extraneous to litigation. And we know that, therefore, just from the pleadings. We also know that no one can win a co-promotion deal in a patent infringement lawsuit. No one can win a distribution agreement in a patent lawsuit. These are all things that are extraneous. The other bonus point that, if you will, that Judge Breyer talks about is if the generic ends up being better off financially through the settlement than if the generic had won the litigation. And we plead that. So in this deal, Watson ends up being better off cutting a deal where it can get no authorized generic competition eventually when it enters the market. And it gets to get half of the net revenues of one drug that Warner Chilcot developed. It gets to get 70% of the net sales off of another drug that Warner Chilcot developed. It ends up being better off than if it had won the litigation, gone to the market, and gone into a competitive environment. Activists, by the way, didn't involve a bag of cash passed off at Dunkin' Donuts or something like that. It involved business deals just like this, co-promotion deals, where in exchange for one thing, the generic gets some cash. Well, that's precisely what we're alleging here. It's the same kind of thing. So this notion that activists was only limited to cash, the cash came from the context of a business deal, precisely like the kind of thing that we are alleging here. But we actually have here more because we have not only business transactions in which cash is being passed, but we're also having this no authorized generic agreement, which is essentially, if you look at it, it's a naked agreement not to compete with one another. The Supreme Court and license cases and the Patent Act, that's already been decided in activists. In activists, the Supreme Court cited the Patent Act. But the Patent Act didn't give license, no pun intended, to the defendants to engage in this kind of conduct. And I think if you go through our reply brief, we unfortunately dealt with this issue ad nauseum in terms of what all of the Supreme Court cases hold in this regard. At bottom, what the Supreme Court cases hold regarding licenses, it's just like a contract. You have a right to enter into a contract. It doesn't mean you have a right to price fix. You have a right to enter into a license. That doesn't mean you get to use licenses in anti-competitive ways. Finally, this notion, Judge Thompson, about the environment in 2009 in which this worked, well, what you were just told is not true. The truth is that at this time in 2009, in terms of first what the law was regarding reverse payments is that there was only two circuit courts that had come out. One circuit court, only one circuit court had upheld the scope of the patent test. Another circuit court had said that these deals are per se illegal. A third circuit actually had come out with a different test. So it was quite a question as to whether or not there was going to be antitrust liability. But sophisticated drug companies knew what they were doing with their eyes wide open because no sophisticated drug company is going to say it's okay to accept a payoff for generic delay. That basic principle they knew they wouldn't be able to get around. And in terms of what it was that the market looked like in terms of authorized generics, and this, by the way, is in our reply brief, so I'm not talking about anything outside the record, what people thought about authorized generic agreements is that they were, excuse me, of what an authorized generic was, was they were very pro-competitive. Having brand companies compete with the first generic reduces price. They're pro-competitive. Therefore, if you enter into an agreement not to do that, that's going to be not competitive. And that was widely accepted. And the fact that authorized generics were lawful and that, therefore, agreements not to enter them would be anti-competitive was known at that time. That's in our reply brief. So I'll leave it there unless there's any further questions. Thank you.